1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

7

8

9

10

11

TARA MELLINGER,

                Plaintiff,

    v.

KENNETH J. BRAITHWAITE,

                Defendant.

CASE NO. C18-5838 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

12

13

14

15

      This matter comes before the Court on Defendant Secretary of the Navy's ("the

Navy") motion for summary judgment. Dkt. 15. The Court has considered the pleadings

filed in support of and in opposition to the motion and the remainder of the file and

hereby grants in part and denies in part the motion for the reasons stated herein.

16

## I.   PROCEDURAL HISTORY

17

18

19

20

      On October 16, 2018, Plaintiff Tara Mellinger ("Mellinger") filed a complaint

against the Navy alleging sexual harassment and retaliation/wrongful termination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* Dkt. 1.[1]

21

22

---

[1] Mellinger was married after the events in this case and changed her name. Dkt. 21 at 1. Some of the evidence in this case refers to Mellinger using her previous name, Tara Convis. *Id.* The Court will use the name Mellinger throughout for clarity.

On February 13, 2020, the Navy moved for summary judgment. Dkt. 15. On February 23, 2020, Mellinger responded. Dkt. 21. On March 6, 2020, the Navy replied. Dkt. 23. On April 7, 2020, the Navy filed a notice of supplemental authority. Dkt. 27.

On July 10, 2020, the Court requested a surreply from Mellinger. Dkt. 32. On July 16, 2020, Mellinger surreplied. Dkt. 33. On July 17, 2020, the Navy filed a surreply objecting to the scope of Mellinger's surreply and requesting leave to surreply. Dkt. 34. On July 20, 2020, the Court granted the Navy leave to surreply. Dkt. 36. On July 24, 2020, the Navy surreplied. Dkt. 37. On July 31, 2020, the Court issued an order denying the Navy's motion. Dkt. 44.

On August 14, 2020, the Navy filed a motion for reconsideration arguing that the Court should amend its order because it granted summary judgment on one theory of Mellinger's retaliation claim. Dkt. 45. On August 31, 2020, the Court granted the Navy's motion, Dkt. 49, and now issues this amended order.

## II.   FACTUAL BACKGROUND

Mellinger began employment with the Navy at the Puget Sound Naval Shipyard on August 24, 2015. Dkt. 1, ¶ 2.2. She worked in Shop 71, the painting shop. *Id*. Her supervisor was Josh Austin ("Austin"). Dkt. 22-1 at 1.[2] She did not receive any type of equal opportunity employment-related training. *Id*. Her stand-in superintendent was Kevin Jones, and her Work Lead was Dom Bryant ("Bryant"). *Id*. at 3. Mellinger was a probationary employee throughout the duration of the period at issue. Dkt 18, ¶ 2.

---

[2] The Court cites ECF page numbering throughout.

**A.      Overview of Harassment as Described in Post-Termination Investigation**

In a November 14, 2016 declaration Mellinger gave in the Navy's investigation of her case, Mellinger declares that a male co-worker, Stephen Nnadede ("Nnadede") began sexually harassing her during the first week after she finished training, in October or November of 2015. Dkt. 22-1 at 4. In a letter dated May 26, 2016, attached to the November 14, 2016 declaration, she explained that Nnadede would "constantly make sexual jokes or ask questions about my sexual life all of which I did not want to talk about. I would either blatantly tell him I did not want to talk about it, or I would try and find a way to either change the subject or 'play dumb,' like I did not understand that he was making sexual remarks and coming on to me." Dkt. 22-1 at 9. She described comments Nnadede made such as "I bet your boyfriend must be really good in bed to keep you around!" followed by "I wish I had someone like you." *Id*. She described an incident where Nnadede showed her a picture of his wife and in response to her comment that his wife was beautiful and he was lucky, Nnadede stated "she's ok, it would have been better if I would have waited and found you then I wouldn't be so lonely." *Id*. Mellinger explained that these statements were specific examples of conversations which "happened quite often." *Id*.

Mellinger explained that Nnadede manipulated her into giving him her phone number and called and texted repeatedly despite her telling him she did not talk to coworkers outside of work. *Id*. When she emphasized that they were coworkers and not friends, and that she was in a happy relationship and had a child, Nnadede stated "well he can have you at home and I can have you at work, I think that is only fair?" *Id*. at 9–10.

1    She also explained that Nnadede attempted to engineer a bet where he would get to drive

2    her to her parking place after work, causing her to run three-quarters of a mile to her car

3    to avoid that outcome. *Id*. at 10.

4         Mellinger's letter also stated that she would catch Nnadede staring at her butt

5    whenever she was not looking. *Id*. She stated that Nnadede asked her whether she had

6    been working out because her butt looked bigger, and she got angry and told him to stop,

7    but he continued. *Id*. She then "tried to make sure [she] never wore any clothes that could

8    be considered suggestive." *Id*. She testified that she did not remember specifically when

9    Nnadede had stared at her butt and that she had not asked him to stop staring at her butt.

10   Dkt. 16-1 at 10–12.[3] She testified that Nnadede commented during work that she had

11   "good hips and a big butt" and that she did not remember what she said in response. *Id*. at

12   13. The letter stated that she would be late to work to avoid being assigned to work near

13   Nnadede. Dkt. 22-1 at 10. It also explained that on April 21, 2016, she found herself

14   alone with Nnadede and told him her knees were hurting, and he replied "well maybe you

15   shouldn't spend so much time on your knees." *Id*. After she tried to change the subject,

16   she felt a twinge in her back and remarked on it, and he replied "well we all know women

17   spend a lot of time on their backs." *Id*.

18        Mellinger declared that Austin told Jesse Case, one of Mellinger's co-workers,

19   that Austin was afraid Mellinger would file an Equal Employment Opportunity ("EEO")

20   claim. Dkt. 22-1 at 4. She declared that because Austin was telling other workers of his

21

22        [3] Dkt. 16-1 is Mellinger's deposition in this case, while Dkt. 16-2 is Mellinger's deposition before the Equal Employment Opportunity Commission.

fear, she knew that he did not want her to complain and she feared he would retaliate against her. *Id.* However, she testified that she did not think anyone in management at the Navy knew Nnadede was harassing her before she reported harassment to Austin on April 22, 2016. Dkt. 16-1 at 14. Austin declared that he never told anyone he was afraid Mellinger would file an EEO claim and he was not afraid she would do so. Dkt. 17, ¶ 27.

**B.  Lateness**

Mellinger admitted in her declaration that during her last two months of employment she had been late to work and sometimes failed to notify Austin that she would be late. Dkt. 22-1 at 6. She also admitted she had been counseled on attendance issues in January 2016 and March 2016. *Id.* In her letter, she explained that she began to be late for work in order to avoid being assigned to a job where she would be near Nnadede, though she "blam[ed] it on my son not dealing with me leaving very well in the morning." *Id.* at 10. She testified that she told Austin "whatever he would listen to at that point." Dkt. 16-2 at 11.

Austin declared that when employees were late, particularly when they did not notify him as Mellinger sometimes did not, that made it very difficult for him to schedule and staff the day's work. Dkt. 17, ¶ 5. Austin declared that he met with Mellinger for a pre-action interview to discuss her lateness on March 18, 2016. *Id.* ¶ 8. He declared that he offered to request a different start time or different crew for Mellinger from the resource office to accommodate her schedule and offered to help her write a hardship letter in support of a request for a different shift, but she declined these offers and told

him the crew's start time would no longer be a problem. *Id.* ¶ 9.[4] He also declared that after this meeting, he told the resource office about Mellinger's attendance problems, and the resource office issued a letter of caution. *Id.* ¶ 11. Austin gave Mellinger the letter on or around April 8, 2016, which stated in part "future misconduct of any kind may result in formal disciplinary action, up to and including your removal from employment." *Id.* Mellinger testified that she asked human resources sometime between February and April of 2016 if she could be assigned to a different shift because of challenges getting her son to daycare, but they said it wasn't possible with the "helper trainer school." Dkt. 16-2 at 14–15.

Mellinger stated in her letter that she requested to work weekends to avoid Nnadede and that her "entire work life was miserable." Dkt. 22-1 at 6. Mellinger testified that she was "purposely late to work between 70 and 80 percent of the time because if I was late to work I wouldn't be assigned to the same jobs a[s] Stephen Nnadede." Dkt. 16-2 at 12–13.

Austin declared that Mellinger was between six minutes and two hours late on eleven days between February 29, 2016 and April 20, 2016, and entirely failed to appear for a shift she had volunteered to work on April 16, 2016. Dkt. 17, ¶ 7. He declared that Mellinger was out sick from March 7, 2016 through March 11, 2016 and on March 14, 2016, and on vacation from March 28, 2016 through April 7, 2016, making her "late on many of the days she actually worked from late February through April 2016." *Id.*

---

[4] The shop resource office is similar to human resources for specific shops at PSNS, while the Navy's Human Resources department serves PSNS in general. Dkt 18, ¶ 1.

Regarding other coworkers, Mellinger declared that a male coworker, Virgo Banks ("Banks") was regularly tardy, "much later than I was and way more often." Dkt. 22-1 at 6. When she asked Banks if he had ever been written up for being late, he said he had not. *Id*. at 7. Austin declared that Banks was late on substantially fewer occasions than Mellinger, and, unlike Mellinger, regularly notified Austin when he was going to be late which allowed Austin to plan for his absences. Dkt. 17, P 16. Specifically, Austin declared that Banks was late on four instances between late February and April 2016. *Id*.

On April 20, 2016, Austin declared that he met with Mellinger for a second pre-action meeting on the lateness issue. Dkt. 17, P 12. They also discussed an unauthorized visit to the union office she had made the day before, April 19, 2016, and Austin completed a second pre-action investigation report regarding that absence. *Id*. P 14. Austin declared that Mellinger told him she had submitted a hardship letter that morning and told him that she had not spoken to the resource office previously. *Id*.

Austin recommended that Mellinger be terminated due to her attendance issues and forwarded a written recommendation and his report to the resource office. Dkt. 22-4 at 4; Dkt. 17, P 15. That same day, Deena Mead ("Mead"), the shop resources manager, received Austin's pre-action reports regarding Mellinger's tardiness and the trip to the union office and also made a written recommendation that Mellinger be terminated based on repeated tardiness. Dkt. 18, P 5.

**C.    Report of Harassment**

On April 21, 2016, as noted in Mellinger's letter, Nnadede made sexual comments about Mellinger spending too much time on her knees and back despite her efforts to change the subject. Dkt. 22-1 at 10.

On April 22, 2016, a Friday, Mellinger told Austin that Nnadede was sexually harassing her and she wanted Austin to talk to Nnadede and make it stop. Dkt. 22-1 at 4, 11; Dkt. 1, ⁋ 2.8. Mellinger explained in her letter that she had put off telling Austin about the harassment because he was "really high strung and inconsistent in how he would respond to workers coming to him with problems." Dkt. 22-1 at 11. Mellinger testified that this was the first time she had told anyone at the Navy about Nnadede's comments. Dkt. 16-1 at 9. Austin declared that he had no awareness of Nnadede's harassment prior to Mellinger's complaint. Dkt. 17, ⁋ 17.

Mellinger declared that Austin told her he did not think he could talk to Nnadede and told her that he needed to talk to his supervisors and make an official report. Dkt. 22-1 at 4. Austin declared that he asked both Mellinger and Nnadede for written statements and forwarded the statements to the shop's resource office. Dkt. 17, ⁋ 18. Mellinger testified that the written statement matched what she told Austin. Dkt. 16-1 at 6. Michael Riedel ("Riedel"), Mellinger's third-level supervisor, declared that according to his notes he and Mead were informed of Mellinger's allegations that day, met with her immediately, and had her write a statement. Dkt. 22-3 at 3.

The written statement Mellinger provided to Austin described an incident in February 2016 when Nnadede said "[s]o how excited are you to go to Japan, I bet you are

1   going to be extremely busy in your hotel room?" *Id*. Mellinger replied that she expected

2   to be busy sight-seeing, and when Nnadede persisted, she stated "I really don't want to

3   talk about my sex life with a coworker." *Id*. She described an incident at an unspecified

4   time when Nnadede asked her "[w]hat do you think Tara[,] does a man[']s penis size

5   matter?", she responded "I'm not sure," and he stated "I bet your man knows how to

6   work it, he must know to keep you around." *Id*. at 29. She also described the April 21,

7   2016 incident where Nnadede implied that Mellinger spent a lot of time on her knees and

8   back. *Id*. at 28. Mellinger wrote in her statement that "[a]ll of these conversations were

9   extremely awkward and uninvited even after I explained I did not want to talk on these

10  subjects." *Id*. at 29.

11      The written statement also explained that Nnadede texted Mellinger even when

12  she did not respond and that he called her "numerous times after I had explained on a few

13  occasions that I did not like talking on the phone with co-workers unless it pertained to

14  work." *Id*. at 28. When Nnadede said "well I thought we were friends, don't friends call

15  eachother [sic]," Mellinger responded that they were coworkers. *Id*. at 29.

16      An exhibit attached to Mellinger's deposition shows some text messages between

17  her and Nnadede related to her absence from work and a work call. Dkt. 16-1 at 35. She

18  testified that she did not remember whether there were additional texts. *Id*. at 21.

19      Mellinger alleges that the Navy's policies call for a fact-finding investigation for

20  general misconduct or rule or safety infraction concerns, conducted by a supervisor to

21  determine whether discipline is appropriate. Dkt. 1, ¶¶ 2.11, 2.13. She alleges that the

22  policies call for an administrative investigation when a complaint or concern raises the

potential for a discrimination or harassment complaint, conducted by an independent, outside investigator who produces a written report. *Id*. ❡❡ 2.12–2.13.

Mellinger alleges that the Navy did not initiate an administrative investigation into her report but declared that the stand-in supervisor assured her she would not be assigned to work in Nnadede's presence pending an investigation. Dkt. 1, ❡ 2.15; Dkt. 22-1 at 4, 5, 11. Mead declared that she took Mellinger's complaint to the Navy office which decides whether an administrative investigation or a fact-finding investigation is necessary and was instructed to proceed with a fact-finding investigation. Dkt. 18, ❡ 12.

**D.    Continuing Harassment**

Mellinger declared that the next Monday, April 25, 2016, Bryant assigned her to work in an area in close proximity to Nnadede. Dkt. 22-1 at 5–6, 11. She testified that Nnadede was working on the flight deck, above the deck where she was assigned, "[a]nd all of a sudden the people on the flight deck were done with their jobs and decided to come hang out with us. He was on that job." Dkt. 16-2 at 20.

Mellinger explained in her letter that when Nnadede came into her workspace, he again stared at her butt. Dkt. 22-1 at 11. She testified that she left the area, waited for Austin for almost an hour, and when he did not appear, talked to Bryant. Dkt. 16-2 at 20. She testified that she began to tell Bryant that she had been told she was not supposed to be working with Nnadede, but "ended up not finishing the sentence, because at that point I had realized there was no point because he probably didn't know anything . . ." Dkt. 16-2 at 20. Bryant declared that he had been told to keep Mellinger and Nnadede apart and did not recall having Mellinger work alongside Nnadede. Dkt. 22-2 at 3. Mellinger

testified that she did not remember whether she had said anything to Bryant other than that Nnadede was in her workspace, and that Bryant responded "It's fine. Go back to work." Dkt. 16-1 at 15. She testified that when she went back to work, she made every effort to avoid Nnadede, but he continued to stare at her, and she "felt like prey" for the remaining two or three hours of her shift. Dkt. 16-2 at 22.

Riedel declared that on that same day, he had interviewed each of the three witnesses Mellinger had listed in her statement and "had a pre-action investigation conducted on Mr. Nnadede." Dkt. 22-3 at 3–4. Reidel also declared that he concluded Mellinger's allegations were unsubstantiated, though it is unclear whether this occurred that same day or at another time. *Id.* at 4.

Mellinger testified that after she spoke to Austin on April 22, 2016 Nnadede did not call, text, or offer her rides for the remainder of her employment, and she did not recall whether Nnadede spoke to her again. Dkt. 16-1 at 17.

**E.     Camera Phone**

On April 26, 2016, Austin saw Mellinger had a prohibited camera on her cell phone at work, reported her to security, and reported the violation to the resource department with the recommended that she be terminated. Dkt. 17, ¶¶ 21–23.

Mellinger declared that during the incident in question on April 26, 2016, she was seated next to Banks, who also had a prohibited camera on his cell phone but Austin did not ask to see the phone and so Banks was not caught or disciplined. Dkt. 1, ¶ 2.18; Dkt. 22-1 at 7. Mellinger declared that there was no way Austin could have failed to see Banks's phone and that Banks had been caught with a phone on an earlier date. Dkt. 22-1

at 7. She testified that she knew Banks had a camera phone on April 26th because she had

watched him take a picture of himself with it a few hours previously and watched him put

the phone "down on his lap as soon as Josh Austin walked through." Dkt. 16-2 at 24.

However, when asked at deposition whether Austin saw Banks's phone on April 26,

2016, Mellinger replied that she did not want to speculate, and when asked if she had a

hunch either way, she responded "I'm generally wrong, so I don't, I don't know." *Id.* at

25.

Austin declared that he was seated across the table from Mellinger, saw that her

phone looked like an iPhone, and "[b]ecause I did not remember ever seeing her with a

phone before, I asked her if the phone had a camera in it." Dkt. 17, ¶ 21. Austin declared

that Mellinger "denied that the phone had a camera, and quickly put the phone in her

pocket." *Id*. Austin declared that quickly putting the phone away seemed suspicious, so

he asked to see the phone and found that it had an operational camera. *Id*. Austin also

declared that had Mellinger self-reported, he would have taken her to security but would

not have recommended her termination. *Id*. ¶ 24. Further, Austin declared that he has

never seen other members of his crew "including but not limited to Virgo Banks, with a

camera phone or any type of camera," and that if he had, he would have reported it to

security. *Id*. ¶ 25.

Mellinger declared that she knew having a camera on her phone in the Controlled

Industrial Area ("CIA") was a direct violation of policy. Dkt. 22-1 at 7. Mellinger

declared that though Austin had testified he did not know Banks had a phone, Austin had

used his work phone to call and text Banks's cell phone while Banks was at work. Dkt.

22-1 at 7. Mellinger declared that a supervisor named Charlie Parker ("Parker") had

caught Banks with a camera phone three months after he was hired but gave Banks the

option to self-report and he was disciplined but not fired. *Id*. at 7. Mellinger stated in her

letter that Banks was also a probationary employee. Dkt. 22-1 at 11. Mellinger also

declared that another male worker on Parker's crew was caught by supervisor named

Jeremy Seevers with a camera cell phone and told to take the phone to his car without

being disciplined. *Id*. at 7. That worker was then caught by a higher-level supervisor and

was suspended for five days but not fired. *Id*.

Another supervisor in Shop 71, Keith Clark ("Clark") declared that "the decision

on whether to report an employee who is caught with the phone or just let them go turn it

in to security is up to the supervisor." Dkt. 33-1 at 8. He declared that in his experience in

the shop, the general practice for supervisor is that the first time an employee is caught,

"the supervisor tells the employee to take the phone out of the shipyard right away, but

we don't report them for discipline." *Id*. He also declared that

> Over the years since the cell phone rules were put in place, I probably
> caught 5 or so employees, probationary and non-probationary with cell
> phones that had cameras. I've also seen other supervisors do the same.
> Some of them would deny it and then we (supervisors) would tell them to
> hand it over and find out it was a camera phone. We gave employees a
> chance to self-report to security or put their phones in the security box, or
> just take the phone to their cars if it was the first time we ever saw them
> with a camera phone.

*Id*. at 9.

Mead declared that Mellinger's version of Banks's previous experience with a

camera phone is incorrect. Dkt. 18, ¶ 10. Mead declared that during Banks's second week

1    of work, he realized he had a camera phone in his pocket, immediately powered the

2    phone off, went to the shoe trailer to put on his work-required boots, and then reported

3    himself to his supervisor. *Id*. Mead declared that employees who self-report are typically

4    treated more leniently because they have demonstrated responsibility and understanding

5    of the rules. *Id.*

6        Additionally, Mead declared that she was not aware of any probationary employee

7    at PSNS who was caught with a camera in the CIA and was not discharged. *Id*. ¶ 7. She

8    declared that between 2016 and 2017, eleven probationary employees at PSNS were

9    caught with cameras in the CIA and all were terminated. *Id*. ¶ 8. Mead also declared that

10   the unnamed employee on Parker's crew was not a probationary employee. Dkt. 26, ¶ 1.

11   Robin Jones, Deputy Production Resources Administrative Manager for Code 900A at

12   PSNS, covering Shop 71, declared that supervisors do not have authority to choose

13   whether or not to report camera phone violations. Dkt. 41, ¶ 2. She declared that

14   supervisors are required to report camera phone violations to both the resource office and

15   security. *Id*.

16       Reidel reviewed Mellinger's file and agreed with Austin's recommendation to

17   terminate Mellinger based on the violation and her attendance issues. Dkt. 22-3 at 4.

18   Mead also reviewed the violation and recommended termination based on the violation

19   and the attendance issues. Dkt. 22-4 at 4. Mead's recommendation that Mellinger be

20   terminated for attendance issues was still pending at this point. Dkt. 18, ¶ 5. Reidel

21   forwarded his recommendation to human resources and Dan Cox ("Cox") that same day.

22   Dkt. 22-4 at 5. Mead declared that she believed Cox made the termination decision, but

1    she issued the termination action. Dkt. 22-4 at 5. Cox declared that he reviewed the

2    supporting paperwork and letter of termination, felt the recommendation to terminate was

3    supported, and signed the termination letter issued to Mellinger. Dkt. 16-3 at 4. He

4    declared that discipline other than termination would have been considered at the shop

5    level by "Mr. Reidel and his folks," but the violations he reviewed were "more than

6    adequate grounds to recommend termination." *Id.* at 5. Cox also declared that he had no

7    knowledge whatsoever of Mellinger's harassment complaint at the time he made the

8    termination decision. *Id.* at 5.

9           On April 27, 2018, Mellinger was terminated. Dkt. 1, ⁋ 2.19. The termination

10   letter listed two reasons for the termination—her lateness and failure to notify her

11   supervisor about being late over the preceding two months, and the camera phone

12   violation. Dkt. 22-5 at 2. Mellinger declared she believed she was terminated based on

13   sex because "[t]he probationary workers who were tardy all the time and were caught

14   with camera cell phones were not fired. They were male and had not made sexual

15   harassment complaints." Dkt. 22-1 at 8.

16          After her termination, Mellinger alleges that her "second level" supervisor asked

17   her coworkers whether they had observed the sexual harassment she alleged. Dkt. 1, ⁋

18   2.20. Mellinger identified three co-workers who witnessed some of the harassment—

19   Jeffrey Sloan, Banks, and Josh Brown. Dkt. 22-1 at 5. Each denied witnessing

20   harassment, and Nnadede denied engaging in harassment. *Id.* Mellinger declared that

21   each was lying because they did not want to get fired as "[r]etaliation is a fact of life at

22   the [N]avy base." *Id.* In June 2016, the Navy issued a report "concluding that

1    [Mellinger's] allegations of sexual harassment were unsubstantiated by her co-workers

2    who remained employed after her termination." Dkt. 1, ⁋ 2.21. Mellinger declared this

3    was because "[t]he Navy is never going to find itself guilty of anything." Dkt. 22-1 at 6.

### III.   DISCUSSION

**A.    Summary Judgment Standard**

6         Summary judgment is proper only if the pleadings, the discovery and disclosure

7    materials on file, and any affidavits show that there is no genuine issue as to any material

8    fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

9    The moving party is entitled to judgment as a matter of law when the nonmoving party

10   fails to make a sufficient showing on an essential element of a claim in the case on which

11   the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

12   (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

13   could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

14   *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

15   present specific, significant probative evidence, not simply "some metaphysical doubt").

16   *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

17   there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

18   jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477

19   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

20   626, 630 (9th Cir. 1987).

21        The determination of the existence of a material fact is often a close question. The

22   Court must consider the substantive evidentiary burden that the nonmoving party must

1   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

2   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

3   issues of controversy in favor of the nonmoving party only when the facts specifically

4   attested by that party contradict facts specifically attested by the moving party. The

5   nonmoving party may not merely state that it will discredit the moving party's evidence

6   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

7   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

8   nonspecific statements in affidavits are not sufficient, and missing facts will not be

9   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

10  **B.    Merits**

11          Mellinger brings two claims: (1) that she was sexually harassed by a coworker and

12  the Navy failed to effectively respond and (2) that her termination was motivated by

13  retaliation for her sexual harassment complaint. Dkt. 21 at 6. The Navy moves for

14  judgment on both.

15          **1.    Sexual Harassment**

16          To establish a prima facie case of a hostile work environment caused by sexual

17  harassment, the plaintiff must show that because of her sex, "she was subjected to

18  unwelcome conduct that was 'sufficiently severe or pervasive to alter the conditions of

19  [her] employment and create an abusive working environment.'" *Campbell v. Haw. Dep't*

20  *of Edu.*, 892 F.3d 1005, 1016–17 (9th Cir. 2018) (quoting *Fuller v. Idaho Dept of Corr.*,

21  865 F.3d 1154, 1161 (9th Cir. 2017)). "The work environment must be both subjectively

22  and objectively perceived as abusive," considering all circumstances and focusing on the

frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's work performance. *Id*. at 1017 (citing *Fuller*, 865 F.3d at 1161). None of these factors are mandatory, and the necessary "'severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)).

An employer defendant may be held accountable for the actions of an individual who does not qualify as an employer "only if, after learning of the harassment, it failed to take prompt corrective measures that were 'reasonably calculated to end the harassment.'" *Campbell*, 892 F.3d at 1017 (9th Cir. 2018) (quoting *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006)). "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001). "By opening a sexual harassment investigation, the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace." *Id*.

"[A]n employer's actions will not necessarily shield it from liability if harassment continues." *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) (citations omitted). Whether corrective action ended the harassment is relevant to whether the employer's actions were reasonable, though unsuccessful employer efforts are not conclusive on the issue of unreasonableness. *Campbell*, 892 F.3d at 1018. Additionally,

1    reasonableness is evaluated "only from the perspective of what the employer knew or

2    should have known at the time it acted." *Id*.

3         The parties focus their dispute on the reasonableness of the Navy's response to

4    Mellinger's complaint and the appropriate characterization of the April 25, 2016 staring

5    incident. The parties agree that the Navy's obligation to act began on April 22, 2016

6    when Mellinger complained to Austin about Nnadede's harassment. Dkt. 15 at 18; Dkt.

7    21 at 6. The parties also agree that the Navy responded promptly to Mellinger's

8    complaint.

9         Mellinger argues, somewhat confusingly, that "even when, on April 25th, Mr.

10   Nnadede was assigned to work in a 20 square foot room with Ms. Mellinger, this would

11   not necessarily have exposed the employer to liability." Dkt. 21 at 7. She concedes that

12   "assigning the two to different work crews appears to have been 'reasonably calculated'

13   to keep them apart, per *Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001)." *Id*. However,

14   Mellinger also argues that because after she reported that Nnadede was in her work

15   space, Bryant ordered her to continue working and Nnadede stared at her, making her feel

16   "like prey," the Navy's remedial action was not effective and allowed behavior Mellinger

17   had complained of to continue. Dkt. 21 at 7–9. She specifies

18              There is evidence in the record to show that Mr. Bryant, who had been
                specifically ordered to make sure that Ms. Mellinger and Mr. Nnadede did
19              not work in proximity because she had made a sexual harassment
                complaint, and who had been notified that this happened, actually ordered
20              Plaintiff back into close quarters with Mr. Nnadede. There is also evidence
                in the record to show that he continued to engage in the same kind of
21              sexually harassing behavior (staring at her) that she had complained of.

22

ORDER - 19

1   *Id.* at 9. The Court thus understands Mellinger to argue that because a supervisor who

2   was aware of Mellinger's complaint and aware of the Navy's plan to keep the two apart

3   allegedly ordered Mellinger back to work in the small space and Nnadede continued to

4   stare at her for two to three hours, showing he was not deterred by the Navy's actions, a

5   reasonable jury could conclude that the Navy's plan was not effectively implemented.

6       The Navy argues that under *Swenson*, the degree of separation it imposed was

7   reasonably calibrated to "the severity of the alleged harassment and the evidence

8   provided to the employer in support of the complaint." Dkt. 15 at 19 (quoting *Swenson*,

9   271 F.3d at 1192). The Navy also argues that it indisputably took steps that were

10  "*reasonably calculated* to end the harassment of which it was aware." Dkt. 15 at 21; Dkt.

11  23 at 2 (quoting *Campbell*, 892 F.3d at 1018).

12      The Court finds that there is a genuine dispute of fact as to whether the Navy's

13  response was effectively implemented. *Compare Reynaga v. Roseburg Forest Prods.*,

14  847 F.3d 678, 690 (9th Cir. 2017) (finding dispute of fact as to effectiveness when

15  plaintiff alleged continued harassment after harasser was counseled by management and

16  after employer attempted to separate parties but still assigned them to the same shift) *with*

17  *Campbell*, 892 F.3d at 1019 (finding no dispute of fact as to reasonableness of

18  employer's response to harassment of teacher by students when the school investigated

19  each incident and imposed corrective measures reasonably tailored to each incident). The

20  Navy determined that the appropriate response to the behavior Mellinger alleged was to

21  keep Mellinger and Nnadede apart. Bryant, the work lead, declared that he had been told

22  to keep Mellinger and Nnadede apart. Though he does not recall ordering them to work in

1    the same space, Mellinger testified that she told Bryant that Nnadede was in her work

2    space, Bryant ordered her to continue working, and Nnadede stared at Mellinger's butt.

3    Though it is a close question especially given the Navy's prompt investigation, a

4    reasonable factfinder could conclude that the Navy's response was not implemented in a

5    manner reasonably calculated to end the harassment.

6         The Navy also argues that Mellinger concedes it is not liable for any of the

7    conduct that occurred before Mellinger's report, argues that Mellinger did not alert the

8    Navy that staring was part of her complaint, and argues that staring alone is not severe or

9    pervasive harassment. Dkt. 23 at 4–6 (citing, *inter alia*, *Swenson*, 271 F.3d at 1192;

10   *Campbell*, 892 F.3d at 1017). Regarding staring, the Navy argues that "[s]taring and

11   leering at another employee do not rise to the level of sexual harassment." Dkt. 15 at 21

12   (citing, *inter alia*, *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998)). The

13   Court finds that the Navy has not established as a matter of law that conduct which

14   occurred after notice must be severe or pervasive in isolation. *See Reynaga*, 847 F.3d at

15   687–90 (considering harassment which occurred both before and after plaintiff reported

16   to a supervisor); *but see Daniel v. Or. Health & Sci. Univ.*, No. 3:17-cv-542-SI, 2018 WL

17   3946530, at *4 (D. Or. Aug. 16, 2018) (finding employer acted reasonably in separating

18   employees and plaintiff did not establish that staring and leering following her complaint

19   was sufficiently harassing to support a hostile work environment).

20        Even accepting the Navy's argument that Mellinger did not report staring to

21   Austin, the Court finds that it is a question of fact whether staring is reasonably within

22   the type of sexually harassing conduct she did report and reasonably within the type of

1  conduct the Navy sought to prevent by separating the two employees. The Ninth Circuit's

2  statement in *Swenson* that the plaintiff was not entitled to a harasser-free workplace

3  "merely because she complained about him" is distinguishable because in that case, the

4  Circuit determined that sexual harassment in fact did *not* continue after the employer

5  separated the parties (though the plaintiff testified she would sometimes see the alleged

6  harasser looking at her). 271 F.3d at 1192, 1195. In the instant case, a reasonable juror

7  could conclude that the implementation of the Navy's response did not end the

8  harassment or deter future harassment.

9       Regarding the Navy's liability, as noted, the Navy argues that Mellinger concedes

10  it can only be liable for harassment which occurred after Mellinger made her report. Dkt.

11  23 at 4–5. Mellinger's response concedes that the Navy's obligation to act began the day

12  she made her report but does not appear to concede that prior conduct is outside the

13  Navy's potential liability. Dkt. 21 at 6. The Navy quotes *Swenson*'s statement that "the

14  employer's liability, if any, runs only from the time it knew or should have known about

15  the conduct and failed to stop it." Dkt. 15 at 18 (quoting *Swenson*, 271 F.3d at 1192)

16  (internal quotations and alterations omitted).

17       However, the beginning of the quoted paragraph provides that "[i]f the employer

18  fails to take corrective action after learning of an employee's sexually harassing conduct,

19  or takes inadequate action that emboldens the harasser to continue his misconduct, the

20  employer can be deemed to have 'adopt[ed] the offending conduct and its results, quite as

21  if they had been authorized affirmatively as to the employer's policy." *Swenson*, 271 F.3d

22  at 1192 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998)). Thus, a

1    question of fact as to the reasonableness of the Navy's response means the Navy could be

2    liable for conduct which occurred prior to notice. *Reynaga*, 847 F.3d at 690 (quoting

3    *Nichols*, 256 F.3d at 875–76) ("When the employer undertakes no remedy, or where the

4    remedy does not end the current harassment and deter future harassment, liability

5    attaches for both the past harassment and any future harassment.").

6          Finally, even considering only the conduct Mellinger described in her written

7    statement to Austin—the conduct of which there is no dispute that the Navy was aware—

8    the Court finds a question of fact as to whether the conduct Mellinger describes was

9    sufficiently severe or pervasive to support her claim. *See Davis*, 520 F.3d at 1096 n.11

10   (excluding from its analysis conduct which the Ninth Circuit found disturbing but

11   management was not aware of). The written statement described three fairly explicit

12   sexual conversations over a period of approximately two months—a moderate

13   frequency—in addition to unwanted phone contact. Mellinger testified that she was

14   subjectively upset by the conduct to the degree that she arrived late to work repeatedly

15   and put her job at risk.

16         In *Davis*, the Ninth Circuit considered comments which occurred slightly more

17   than once a month over a seven-month period such as "this is a man's working world out

18   here" and "we don't mind if females are working as long as they don't complain," and

19   concluded the question of sufficient hostility was for the factfinder. 520 F.3d at 1096.

20   The Circuit stated that "[i]n close cases such as this one, where the severity of frequent

21   abuse is questionable, it is more appropriate to leave the assessment to the fact-finder

22   than for the court to decide the case on summary judgment." *Id*. The Court concludes that

1    the balance of frequency and severity Mellinger described results in a question that is

2    similarly best reserved for the factfinder.  Therefore, the Court denies the Navy's motion

3    as to Mellinger's sexual harassment claim.

4        **2.     Retaliation**

5        There is a three-step burden-shifting framework for considering summary

6    judgment in an employment retaliation case. *Brooks v. City of San Mateo*, 229 F.3d 917,

7    928 (9th Cir. 2000). To create a triable issue, the plaintiff first must establish a prima

8    facie case by showing "(1) involvement in a protected activity, (2) an adverse

9    employment action[,] and (3) a causal link between the two." *Id*. Second, the burden

10   shifts to the defendant to present a legitimate reason for the adverse employment action.

11   *Id*. Third, the burden shifts back to the plaintiff to "demonstrate a genuine issue of

12   material fact as to whether the reason advanced by the employer was a pretext." *Id*. "Only

13   then does the case proceed beyond the summary judgment stage." *Id*. A plaintiff may

14   establish pretext "either directly by persuading the court that a discriminatory reason

15   more likely motivated the employer or indirectly by showing that the employer's

16   proffered explanation is unworthy of credence." *Texas Dep't of Comm. Affairs v.

17   Burdine*, 450 U.S. 248, 256 (1981). "Circumstantial evidence of pretext must be specific

18   and substantial in order to survive summary judgment." *Bergene v. Salt River Project

19   Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

20       Regarding the causation standard, the Navy argues that Mellinger must show her

21   complaint was the but-for cause of her termination. Dkt. 15 at 15 (*Univ. of Tex. Sw. Med.

22   Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). However, it argues that under either a but-for

ORDER - 24

1    or a motivating factor standard, Mellinger does not meet her burden to show causation

2    between her protected activity and her termination. *Id*.

3        The Court previously determined that the causation standard for a federal

4    employee's retaliation claim under 29 U.S.C. § 2000e-16 is motivating factor and not

5    but-for. *Rosales v. Spencer*, No. C17-5781 BHS, 2019 WL 6913523, at *2–3 (W.D.

6    Wash. Dec. 19, 2019) (citing *Forman v. Small*, 271 F.3d 285, 296–97 (D.C. Cir. 2001)

7    (reasoning under that broad statutory "made free from" language in the Age

8    Discrimination in Employment Act, 29 U.S.C. § 633(a), retaliation based on underlying

9    complaints of status-based discrimination is construed more broadly in the federal

10   sector)). The Court reasoned that "made free from" language in 29 U.S.C. § 2000e-16

11   applicable to discrimination based on race, color, religion, sex, or national origin should

12   be applied to retaliation claims "consistent with Congress's mandate that federal

13   employees shall be free from any discrimination whether it is a motivating factor in an

14   adverse decision or the reason for the adverse decision." *Id*. at *3.

15       In *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020) ("*Babb*"), the Supreme Court held

16   that in a discrimination claim under § 633a(a), the "shall be made free from any

17   discrimination based on age" language applicable to federal employees does not require a

18   but-for causation standard. Instead, "age must be the but-for cause of *differential*

19   *treatment*, not . . . a but-for cause of the *ultimate decision*." *Id*.[5]

20   ──────────────

21       [5] *Babb* was decided after the close of briefing in this case. *See* Dkt. 27. While *Babb* does not
     require a showing of but-for causation in the employment outcome, it limits most forms of backward-
     looking relief to plaintiffs who show but-for causation in the employment outcome and finds plaintiffs
     who show but-for causation only of differential treatment may seek only forward-looking relief. *Babb*,
22   140 S.Ct. at 1177–78. The parties did not brief any potential applicability of this limitation to retaliation

1    "'[R]etaliation claims may be brought against a much broader range of employer

2    conduct than substantive claims of discrimination." *Annenberg v. Clark Cty. School Dist.*,

3    -- F. App'x. --, 2020 WL 3397748, at *2 (9th Cir. 2020) (quoting *Campbell*, 892 F.3d at

4    1021). "[S]omething done by an employer is an adverse employment action for purposes

5    of a retaliation claim—even if it does not materially alter a term or condition of

6    employment—as long as it would deter a reasonable employee from engaging in the

7    protected activity." *Id.* (citing *Ray v. Henderson*, 217 F.3d 1234, 1242–42 (9th Cir.

8    2000)).

9        To the extent Mellinger argues that Austin's decision to investigate her but not

10   Banks was an adverse employment action, the Court finds that there is insufficient

11   evidence in the record for a reasonable juror to conclude Austin in fact made such a

12   decision.

13       Mellinger cites two cases of male employees with camera phones treated more

14   leniently—Banks and the unnamed employee supervised by Parker. Regarding Banks,

15   two incidents appear in the record—the self-reporting incident, and the April 26, 2016

16   incident. Regarding the self-reporting incident, Mellinger declared that Banks was caught

17   with a camera phone while on Parker's crew but permitted to self-report. Dkt. 22-1 at 7.

18   The Navy's motion cites evidence that in this incident Banks actually self-reported,

19   which is typically treated more leniently. *See* Dkt. 18, ₱ 10. Mellinger appears to concede

20   this point in her opposition brief, arguing "[i]n this evidentiary showing, regarding

21   _____

22   claims or to the instant motion, so the Court considers the potential implications only to the extent
     necessary to decide the issues briefed.

1  pretext, [she] is not claiming that the disparate treatment was terminating her after she

2  was found with a camera phone versus not terminating Mr. Banks when he self-reported

3  having brought a camera phone into the restricted area." Dkt. 21 at 12.

4  Regarding the April 26, 2016 incident, Mellinger declared that when she and

5  Banks were seated next to each other, there was no way Austin could have missed

6  Banks's phone, yet he only asked to see hers. Dkt. 22-1 at 7. Mellinger argues that this is

7  the relevant disparate treatment showing Austin's decision to investigate was pretextual.

8  Dkt. 21 at 11 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). The

9  Navy cites Austin's statements in declaration that he asked to see Mellinger's phone

10 because her behavior was suspicious and that he did not see Banks's phone. Dkt. 17, ¶¶

11 21, 25. The Navy also cites Mellinger's testimony that she did not "want to speculate"

12 when asked whether Austin in fact saw Banks's phone, Dkt. 16-2 at 25, arguing that

13 Austin's declaration is thus uncontradicted. Dkt. 23 at 11 (citing Dkt. 17, ¶ 25).

14 The Court agrees with the Navy. Mellinger testified that her knowledge of whether

15 or not Austin saw Banks's phone would be speculative, and Austin declared he did not

16 see the Banks's phone, but that Mellinger's phone was visible and she reacted

17 suspiciously when asked about it. The Court thus finds there is insufficient evidence for a

18 reasonable factfinder to conclude Austin in fact saw Banks's phone. *See, e.g. Loomis v.*

19 *Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) (speculation does not create dispute of fact on

20 summary judgment).

21 However, either Austin's decision to report Mellinger to security and the resource

22 department or the termination itself may constitute an adverse employment action for the

1    purposes of a retaliation claim. *See Annenberg*, 2020 WL 3397748 at *2 (formal warning

2    and negative performance evaluation which go on personnel file and create risk of more

3    serious discipline in the future sufficient to support retaliation claim). The Navy argues

4    Mellinger cannot establish a prima facie case because she cannot establish that retaliation

5    caused her termination, Dkt. 15 at 15, and because she cannot establish that Austin

6    treated her differently from other employees, Dkt. 23 at 11. Mellinger argues that a jury

7    could find Austin took an adverse employment action against Mellinger when he reported

8    her camera violation and that this action caused her termination. Dkt. 21 at 13.

9            Regarding the termination itself as the adverse employment action, as a threshold

10   issue Mellinger's termination letter cited both her lateness and her camera violation. Dkt.

11   22-5 at 2. Mellinger argues that as the recommendation that she be terminated for

12   lateness was still pending at the time of the camera violation, the facts in the light most

13   favorable to her show that the camera phone actually caused the termination. Dkt. 21 at

14   11. The Navy cites Cox's declaration statement that the issues together constituted "more

15   than adequate grounds to recommend termination." Dkt. 23 at 9 (citing Dkt. 16-3 at 4).

16   Again considering Cox's statement in declaration that Reidel's recommendation for

17   termination was important to his decision and considering that Reidel's recommendation

18   was made the day of the camera violation, Dkt. 16-3 at 4, the Court agrees with Mellinger

19   that there is at least a dispute of fact as to whether the camera violation was the but-for

20   cause of the termination.[6]

21   
22           [6] The Court reaches this decision without considering the parties' discussion in supplemental
     briefing of the hearing before the Employment Security Department.

1    However, the Court agrees with the Navy that Mellinger cannot establish that the

2    decision to terminate her was pretextual. Even if the lower causation standard is

3    applicable and she can establish the prima facie case, her evidence of pretext at the level

4    of the termination decision is not substantial and cannot defeat summary judgment.

5    *Bergene*, 272 F.3d at 1142. Mellinger denies that she is making a "cat's paw" argument,

6    that Austin's biased reporting influenced the adverse action. Dkt. 21 at 13. The Supreme

7    Court explains that "a supervisor's biased report may remain a causal factor if the

8    independent investigation takes it into account without determining that the adverse

9    action was, apart from the supervisor's recommendation, entirely justified." *Staub v.*

10   *Proctor Hosp.*, 562 U.S. 411, 421 (2011). Here, while no independent investigation was

11   conducted, Mellinger does not dispute that the Navy's decisionmaker, Cox, was

12   presented with an accurate report of her camera violation.

13   Mellinger's remaining evidence of pretext is that Banks was permitted to self-

14   report a camera violation (prior to the alleged incident with Austin) and that the unnamed

15   employee on Parker's crew was given a five-day suspension for his camera violation

16   rather than being terminated. In its request for supplemental briefing, the Court asked

17   Mellinger to address the Navy's evidence that the unnamed employee was not

18   probationary. Dkt. 32 at 3–4. Further, the Court explained that it understood Mellinger to

19   concede that Banks in fact self-reported. *Id*. at 3. In response, Mellinger did not dispute

20   the Navy's evidence regarding the unnamed employee or the facts of Banks's self-

21   reporting. Instead, she argues "[e]ither there is a strict prohibition against cameras in the

22   restricted areas of the base, resulting in termination, and it applies to all cameras, no

1   matter who is carrying the camera . . . or there isn't." Dkt. 33 at 2. The Court finds this

2   argument fails to establish pretext. The Navy's evidence is uncontested that at the level of

3   human resources it treats self-reported camera violations more leniently but fires all

4   probationary employees who are reported caught with cameras in the CIA. Therefore,

5   there is no basis for a factfinder to determine that Cox's decision to fire Mellinger based

6   on her security violation differed from the Navy's decision to fire other probationary

7   employees.

8          Therefore, Mellinger's remaining argument is that Austin's decision to report her

9   camera violation constitutes an adverse employment action. Dkt. 21 at 13. Regarding the

10  prima facie case, the Navy does not contest that Mellinger engaged in protected activity.

11  It argues that Austin's decision to report Mellinger cannot be considered an adverse

12  employment action because Austin's reporting followed Navy policy. Dkt. 23 at 8. The

13  Court finds this argument more relevant to pretext rather than what can constitute an

14  adverse employment action. *See Annenberg*, 2020 WL 3397748, at *2 (formal warning in

15  personnel file can be adverse employment action but plaintiff retains burden to show

16  action was pretextual).

17         Considering causation, the Court has determined that Mellinger's evidence that

18  Austin treated her differently from Banks is unsupported. However, Clark declared that in

19  his experience, the practice of supervisors in Mellinger's shop was to not report

20  employees who were caught in a first camera violation. Dkt. 33-1 at 8–9. He declared that

21  he has caught approximately five employees, probationary and non-probationary, with

22

1   camera phones and not reported them, and he has "seen other supervisors do the same."

2   *Id.*

3        Considering that Austin's decision to report Mellinger came just two working days

4   after her harassment complaint, the Court concludes Mellinger has met her burden on the

5   prima facie case even if the but-for standard for differential treatment in *Babb*, 140 S. Ct.

6   at 1171, applies. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1062 (9th Cir. 2013)

7   (temporal proximity is one way a plaintiff can establish retaliation was a motivating

8   factor for an adverse employment action). The plaintiff's burden on the prima facie case

9   is minimal. *Fonseca v. Sysco Food Services of Az., Inc.*, 374 F.3d 840, 849 (9th Cir.

10   2004) (citing *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997)).

11        The parties do not dispute that the Navy has met its burden of production on a

12   legitimate, nondiscriminatory reason for Austin's report. Whether Mellinger's remaining

13   evidence is sufficient to support her burden to establish pretext is a much closer question,

14   particularly since any temporal inference from the proximity of Austin's report to

15   Mellinger's complaint is very weak given her admitted conduct. However, as the

16   factfinder's determination will likely be driven by a weighing of Clark's credibility

17   versus that of the Navy employees, the Court finds a question of fact as to pretext by the

18   narrowest of margins.

19   *//*

20   *//*

21   *//*

22   *//*

## IV.   ORDER

Therefore, it is hereby **ORDERED** that the Navy's motion for summary

judgment, Dkt. 15, is **GRANTED in part** and **DENIED in part**.

Dated this 31st day of August, 2020.

_____

BENJAMIN H. SETTLE
United States District Judge